## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AIRELL MAZER and JOSEPH MAZER,** | **:** | |
| **Plaintiff** | | **CIVIL ACTION NO. 1:19-cv-1838** |
| | **:** | |
| **v.** | | **(JUDGE MANNION)** |
| | **:** | |
| **FREDERICK MUTUAL INSURANCE COMPANY,** | **:** | |
| **Defendant** | **:** | |

### MEMORANDUM

The case centers on a dispute over insurance coverage for home fire loss. Before the court is Defendant Frederick Mutual Insurance Company's motion for summary judgment.

## I.   BACKGROUND[1]

In October 2018, Plaintiffs Airell and Joseph Mazer purchased a residential property in Harrisburg for $100,000. (Doc. 112-2 at 2–3; Doc. 113

---

[1] As required by Local Rule 56.1, Defendant has filed a statement of material facts. (Doc. 113). Rule 56.1 also requires that the party opposing a motion for summary judgment file a statement responding to the numbered paragraphs in the movant's statement of material facts. Plaintiffs have instead filed a "Response in Opposition to Defendant's Motion for Summary Judgment," (Doc. 116), which responds to the numbered paragraphs in Defendant's motion for summary judgment, (Doc. 111), and a counter-statement of material facts. (Doc. 117).

¶3; Doc. 116 ¶3). Defendant issued them a homeowners' insurance policy (the "Policy") covering the property for the period from September 28, 2018 to September 28, 2019. (Doc. 112-3). On November 2, 2018, Plaintiffs' property was damaged by a fire. (Doc. 1 ¶11; Doc. 113 ¶9). Plaintiffs submitted a claim under the Policy. (Doc. 113 ¶10; Doc. 117 ¶4).

A fire investigator inspected the premises and concluded that the cause of the fire was undetermined, (Doc. 118-4), and an Analytical Forensics Associates report found that "[n]o ignitable liquids were detected." (Doc. 118-5). The third-party adjustor retained by Defendant estimated actual cash values for the building, $334,795.07, and for the contents, $2,039.97. (Doc. 118-3). Defendant issued Plaintiffs checks for $333,795.07[2] and $2,039.97. (Doc. 113 ¶17; Doc. 117 ¶15; Doc. 118-11).

On behalf of Plaintiffs, however, C&Z Construction estimated that the replacement cost value for the property would be $686,373.56. (Doc. 112-16; Doc. 113 ¶20; Doc. 117 ¶21). Plaintiffs' adjuster, Jarrod Baker of United Adjusters of America, provided this estimate to Defendant on August 22, 2019, indicating that the Plaintiffs requested payment of the Policy limit.

---

[2] $333,795.07 represented the estimated actual cash value of the building less a $1,000 deductible. (See Doc. 112-3 at 1).

(Doc. 112-15).[3] Robert Pelletier, then Defendant's Chief Claims Officer, responded that he would review the estimate, (id.), and in a follow-up letter the next month requested that Plaintiffs provide certain documentation relating to their claim. (Doc. 113 ¶24; Doc. 112-17). He also informed Plaintiffs of Defendant's position that, pursuant to the Policy, Plaintiffs could not claim replacement costs because (1) they had not yet repaired or replaced the property, (Doc. 112-19 at 1; Doc. 112-3 at 17, §1.C.d ("Section I – Exclusions")), and (2) they had not notified Defendant of their intent to claim replacement costs within 180 days of the loss (Doc. 112-17 at 2; Doc. 112-3 at 17, §1.C.2.e ("Section I – Exclusions")). Mr. Baker responded to Mr. Pelletier's September 24, 2019 letter the same day, expressing disagreement with Defendant's positions and indicating that Plaintiffs would be responding to Defendant's requests. (Doc. 112-18). In response, by an October 9, 2019 letter, Defendant reiterated its position regarding replacement value costs and its request for documentation, and noted the Policy's requirement that the insured "provide us with records and documents we request." (Doc. 112-19). As of the date of filing of their Complaint, Plaintiffs had not provided the requested documents or rebuilt the

---

[3] The Policy covered the property for up to $527,389.00. (Doc. 112-3 at 1).

property. (Doc. 113 ¶¶28, 30; Doc. 112-20 ¶9; Doc. 112-21 ¶9; Doc. 111 ¶¶33, 35; Doc. 116 ¶¶33, 35).

On October 22, 2019,[4] Plaintiffs brought this action claiming that Defendant breached its contract with them by refusing to provide full coverage for their losses and, in so denying them, acted in bad faith in violation of 42 Pa. Cons. Stat. §8371. They seek money damages.

The court has jurisdiction under 28 U.S.C. §1332.


## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable

---

[4] Plaintiffs assert that, despite repeated requests, Defendant never provided them with a copy of the policy, and so "having no knowledge as to whether the policy contains a one year suit limitation provision," they were "compelled to file suit" on October 22, 2019. (Doc. 117 ¶¶13, 24). This assertion is belied by Plaintiff Airell Mazer's testimony that she received a copy of the Policy from Defendant "when the policy was first started." (Doc. 121-2).

jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but

must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## III.   DISCUSSION

Though Plaintiffs attach 20 exhibits to their brief in opposition to Defendant's motion for summary judgment, the brief itself is wholly devoid of citations to record evidence, or even to their counterstatement of material facts. (Doc. 118). This approach has complicated the task of locating genuine disputes of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record … or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute."); *Francis v. Northumberland Cnty.*, 636 F. Supp. 2d 368, 400 (M.D.

Pa. 2009) ("It is not the court's responsibility to dredge through record evidence to find questions of material fact." (citing *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 813, 830 n.8 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record."))).

## A. Breach of contract

Defendant first asserts that Plaintiffs' action is barred by the Policy, which provides that:

> No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of the loss.

(Doc. 112-3 at 17, §1.G ("Section I – Conditions").[5] Among the insured's "Duties after loss," set forth in "Section I – Conditions," are the requirements to "[p]rovide us with records and documents we request and permit us to make copies," and to "submit to examination under oath, while not in the presence of another 'insured,' and sign the same." (Doc. 112-3 at 15, §1.B.7.b–c. ("Section I – Conditions")).

By a September 24, 2019 letter to Mr. Baker, Mr. Pelletier requested that Plaintiffs provide the mortgagee's appraisal of the property at the time

---

[5] Somewhat confusingly, the Policy contains four Section I's—"Section I – Property Coverages," "Section I – Perils Insured Against," "Section I – Exclusions," and "Section I – Conditions"—each with lettered subdivisions starting with "A." (Doc. 112-3).

of purchase, invoices documenting improvements and repairs, the dates of C&Z Construction's visit, the property's agreement of sale and deed, the pre-closing home inspection, the municipal property assessment, and dates when Plaintiffs could be available for videotaped examinations under oath. (Doc. 112-17 at 3). Defendant contends that because Plaintiffs did not provide the requested documents or submit to an examination under oath, (Doc. 111 ¶¶33, 35; Doc. 116 ¶¶33, 35), it is entitled to judgment as a matter of law pursuant to the Policy's "no action" provision. (Doc. 112 at 19). [6]

Plaintiffs admit that they did not provide Defendants with the mortgagee's appraisal, invoices regarding improvements and repairs, dates of C&Z's visit, the agreement of sale or deed, or a pre-closing home inspection or municipal property assessment. (Doc. 116 ¶33). They also admit that they did not submit to an examination under oath. (Id. ¶34). But they counter that the requested materials were not relevant to Defendant's coverage determination and that Defendant did not properly demand an examination under oath. (Doc. 116 ¶¶33–34; Doc. 118 at 10–11).

---

[6] Defendant advanced the same argument in its Motion to Dismiss, (Doc. 5 at 22), but the action was not dismissed on this basis because Plaintiffs alleged that they had fully cooperated with Defendant. (Doc. 16 at 8–10).

Plaintiffs posit that "[i]n order to prevail on this argument, the Defendant must establish that any alleged failures to cooperate resulted in prejudice to the carrier and that any breach of duties by the Plaintiffs were material." (Doc. 118 at 10). For this proposition they rely on *Prudential Prop. & Cas. Co. v. Erie Ins. Co.*, 660 F. Supp. 79 (E.D. Pa. 1986). *Prudential* summarized Pennsylvania law on cooperation clauses in insurance contracts, 660 F. Supp. at 81, by quoting the following passage from *Paxton Nat'l Ins. Co. v. Brickajilik*, 493 A.2d 764, 765–66 (Pa. Super. 1985):

> The purpose of cooperation clauses is to protect the insurer's interest and prevent collusion between the insured, to whose rights the insurer has been subrogated, and the third party tortfeasor. See: Appleman, Insurance Law and Practice §4771. The cooperation clause is a material condition to the liability of the insurer. *Cameron v. Berger*, 7 A.2d 293, 295 (Pa. 1938). Before an insurer is relieved of liability, however, it must show that there was more than an unsubstantial or immaterial departure from the letter of the policy and that the insurer suffered substantial prejudice because of the conduct of the insured. *Conroy v. Com. Cas. Ins. Co.*, 140 A. 905 (1928).

*Prudential* further explained that "prejudice must be demonstrated and it cannot be presumed." 660 F. Supp. at 81 (citing *Federal Kemper Ins. Co. v. Johnson*, 21 Pa. D & C 724, 728 (Pa. Ct. Common Pleas, Cumberland Cnty. 1981)).

Plaintiffs assert that "the jury must determine" whether Defendants' requests for documents was reasonable and a material breach of the

contract. (Doc. 118 at 11). Here they cite *Forest City Grant Liberty Assocs. v. Genro II, Inc.*, 652 A.2d 948 (Pa. Super. Ct. 1995), which also involved a general cooperation clause, not the type of "no action" clause like that at issue here. *Id.* at 951–52. *Forest City* explained that "[a]n insured's duty to cooperate is breached where the insured neglects to disclose information needed by the insurer to prepare a defense, does not aid in securing witnesses, and refuses to attend hearings or to appear and testify at trial or otherwise fails to render all reasonable assistance necessary to the defense of the suit." *Id.* at 952 (internal quotations omitted).

Plaintiffs' argument seems to suggest that the "no action" clause here should be treated like a cooperation clause. "Most insurance policies," including this one,[7] "include what is commonly referred to as a 'cooperation clause.'" 14 Couch on Insurance 3d ed. §199:3. Pennsylvania courts have understood such clauses as a condition to the insurer's liability, *Cameron v. Berger*, 7 A.2d 293, 295 (Pa. 1938), but have required that an insured's breach result in "substantial prejudice" before the insurer's liability is discharged. *Conroy v. Com. Cas. Ins. Co.*, 140 A. 905, 224 (Pa. 1928).

---

[7] One of the insured's "duties of loss" set forth in "Section I – Conditions" is to "[c]ooperate with us in the investigation of a claim." (Doc. 112-3 at 15, §1.B.5).

The "no action" here clause makes compliance a condition to the institution of an action, not to liability. (Doc. 112-3 at 17, §1.G ("Section I – Conditions"); Doc. 121 at 11).[8] It requires "full"—not reasonable—"compliance," and does not purport to require prejudice.

Plaintiffs do not cite authority for the proposition that this type of "no action" clause is only effective upon a showing of reasonableness, prejudice or materiality. And a similar clause has been enforced in this circuit. *See, e.g.*, *RealogicHR, LLC v. Continental Cas. Co.*, 2:22-cv-1573, 2022 WL 17904245, at *3 (W.D. Pa. 2022) (applying Pennsylvania law) ("[T]he 'no-action' clause of the Policy expressly precludes any right to sue Continental, unless the insured complied with all the terms of the Policy. Here, ... RealogicHR did not comply with the terms of the Policy. Therefore, RealogicHR has no right to sue Continental.").

The court is not persuaded to impute such conditions on the "no action" clause here. The clause, and the duties alleged to have been violated here, are unambiguous. And there is no genuine dispute of material fact that Plaintiffs did not provide Defendant the records it requested or submit to an examination under oath.

---

[8] Defendant does not contest liability; it concedes that Plaintiffs are entitled to coverage for their loss. (Doc. 121 at 11).

Plaintiffs take issue with Defendant's requests in two other ways. First, they suggest that they were made "late," "long after the coverage decision was made." Although Defendant issued the actual cash value payment in May 2019, (Doc. 118-11), Plaintiffs sought replacement value coverage on August 22, 2019, (Doc. 112-15), and Defendant made its requests on September 24, 2019. (Doc. 112-17). These requests, made only a month after Plaintiffs' request for replacement value, were thus not late relative to Plaintiff's claim for additional coverage. Second, Plaintiffs assert that Defendant did not "tender[] a compliant formal demand" for an examination under oath, positing that a demand "must expressly state the time and place for the examination and the person before whom it should take place." (Doc. 118 at 10 (citing *Nicolai v. Transcontinental Ins. Co.*, 378 P.2d 287, 288 (Wash. 1963))). Defendant here requested that Plaintiffs supply "[d]ates that the Mazers can be made available for videotaped examinations under oath" (Doc. 112-17 at 3). The court need not decide whether this request was sufficient, because Plaintiffs failed to comply with the Policy by not providing the documents requested by Defendant.

Because Plaintiffs have not fully complied with the terms of the Policy, the "no action" clause prohibits them from bringing an action for breach of

contract. Defendant is therefore entitled to judgment as a matter of law on Plaintiffs' breach of contract claim.

### B. Bad Faith

Because Pennsylvania law provides a statutory cause of action for insurer bad faith, 42 Pa. Cons. Stat. §8371; *Metro. Grp. Prop. & Cas. Ins. Co. v. Hack*, 312 F. Supp. 3d 439, 445 (M.D. Pa. 2018), the court considers Plaintiffs' bad faith claim despite the Policy's "no action" clause.

A §8371 bad faith claim requires that a plaintiff "present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017).

Plaintiffs allege a litany of bad faith conduct on Defendant's part. (Doc. 1 ¶27a–t). But they fail to present clear and convincing evidence that Defendant lacked a reasonable basis for denying coverage and recklessly disregarded its lack of a reasonable basis. This is not a case in which Plaintiffs claim that Defendant wrongly denied them coverage altogether; they were paid $335,795.07. (Doc. 117 ¶15; Doc. 118-11). Instead, they appear to be dissatisfied primarily with the amount and speed of their payment.

In support of this claim, Plaintiffs offer the report of their expert Kevin M. Quinley, (Doc. 118-20), who concluded that Defendant's "claim handling breached insurance claim industry norms, customs and practices" and that its "claim-handling processes were deficient in myriad respects, including but not limited to the chief industry yardsticks of a reasonable investigation, a reasonable evaluation and a reasonable negotiating process." (Id. at 43). First, the court cannot simply accept this expert report as a substitute for record evidence. *See Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 262 (3d Cir. 1984) ("[T]he factual predicate of an expert's opinion must find some support in the record."). Second, even if the report's conclusion were evidence that Defendant lacked a reasonable basis for denying additional coverage, it does not speak to the second prong of a §8371 claim: whether Defendant recklessly disregarded its lack of a reasonable basis.

Plaintiffs also reference an "internal memorandum contained in the claim file" that "represents a scathing indictment of the Defendant's response and handling of Plaintiffs' claim." (Doc. 118 at 4). Because Plaintiffs' brief does not cite the exhibit containing this memorandum, the court is left to infer that it is Exhibit R, (Doc. 118-18), which is cited in Plaintiffs' counterstatement as "an internal email" in the claim file "discussing the insufficiency and

- 14 -

failures of the Defendant's representatives during its responses to the Plaintiffs' claims." (Doc. 117 ¶27).

This document appears to be the final two pages of an internal report written by claims handler Brian Culp. (Doc. 118-18). Mr. Culp lists a series of "suspicious indicators." (Doc. 118-18 at 2). He next summarizes the investigation that occurred, noting that Lisa Brenneman of NEFCO conducted a cause and origin investigation and concluded that the fire's cause was undetermined. (Id.). He notes that: "In the absence of a finding as to the cause and origin of the fire it would be highly unlikely that a coverage declination could be made based on the fire being intentionally set." (Id.). Mr. Culp reports that "[p]roper investigation should have included … [r]ecorded statements of the insureds," requests for documentation of purchase, prior claims, and renovations, interviews of the contractor, neighbors, and fire/police investigators, news reports, social media, examinations of the insureds under oath, fire/police department reports, and civil records searches. (Id. at 2–3).

Mr. Culp concludes that "[t]he investigation of this claim lacked direction," and that the "independent adjustor … focused on the damages rather than investigation of coverage issues," and "relied on the cause and origin investigator to principally conduct the investigation." (Id. at 3). He

discusses steps that should have been taken (providing the cause and origin investigator with specific tasks, engaging an attorney early on, and giving specific directions to the claims adjustor), and recommends utilizing a special investigative unit for handling suspicious claims. (Id.).

This report is trained on the adequacy of Defendant's investigation with respect to *whether Plaintiffs should have been entitled to coverage*; not with respect to the *amount* of coverage Plaintiffs did receive. Once again, Plaintiffs were paid $335,795.07. They now claim that they should have been paid more. But they fail to explain how this internal report, or other record evidence, demonstrates that Defendant lacked a reasonable basis for *not paying them more*.

Similarly, the Complaint's various theories of bad faith have not been supported. Plaintiffs claim first that Defendant acted in bad faith "by tendering an inadequate amount of money for the building claim" and "low-balling" them. (Doc. 1 ¶27a–b). It is undisputed that the adjustor hired by Defendant estimated an actual cost value of $336,835.04, (Doc. 118-3), which amount Defendant paid Plaintiffs (less a $1,000 deductible). (Doc. 118-110). To the extent Plaintiffs contend that Defendant lacked a reasonable basis for denying payment of the $686,373.56 replacement cost value estimated by C&Z Construction, the Policy does not require replacement value costs until

the property is rebuilt or repaired. (Doc. 112-13 at 17 §1.C.1.d ("Section I –

Exclusions")). Plaintiffs admit that they did not rebuild the property. (Doc.

112-20 ¶9; Doc. 112-21 ¶9; Doc. 111 ¶35; Doc. 116 ¶35).[9]

As to the delay, Plaintiffs allege that Defendant failed "to make a

reasonable effort to negotiate the timely settlement of the building claim."

(Doc. 1 ¶27c.). Plaintiffs made their claim on November 2, 2018, (Doc. 1 ¶11;

Doc. 113 ¶10), and Defendant paid them on May 1, 2019. (Doc. 118-11). "[A]

long period of time between demand and settlement does not, on its own,

necessarily constitute bad faith." *Williams v. Hartford Cas. Ins. Co.*, 83 F.

Supp. 2d 567, 572 (E.D. Pa. 2000) ("[T]he fifteen months Hartford took to

resolve the claim does not provide clear and convincing evidence for a

---

[9] Plaintiffs argue that they should nevertheless be entitled to replacement costs, because Defendant "made it impossible for [them] to contemplate rebuilding." (Doc. 118 at 8 (citing *Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 270 (E.D. Pa. 2019) ("[T]his Court predicts that under Pennsylvania law, an insured would be able to recover replacement cost despite noncompliance with a replacement requirement where the insurer's denial of liability and failure to pay actual cash value prevents the insured from replacing the actual property."))).

They assert, without specificity or citation, that "Defendant restricted the Plaintiffs from access to their own property." (Doc. 118 at 7–8). For a similar assertion made in Plaintiffs' counterstatement of facts, they cite Mr. Baker's testimony that Ms. Breneman told Plaintiffs that they could not access the property pending her cause and origin investigation. (Doc. 117 ¶20; Doc. 118-14 at 2). But Plaintiffs do not dispute that Ms. Breneman conducted her inspection on November 7, 2018 and issued her report on January 21, 2019. (Doc. 117 ¶7; Doc. 118-4). So it is not apparent how this restriction thereafter made it impossible for Plaintiffs to rebuild.

reasonable jury to conclude that Hartford acted in bad faith."). Plaintiffs have not presented evidence that the 6-month delay here constituted bad faith.

They further allege generally that Defendant acted in bad faith by "not proceeding with more dispatch in evaluating and settling the building claim," by "failing to objectively and fairly evaluate the Plaintiff's claim," by "compelling Plaintiffs to institute this lawsuit," by "acting unreasonably and unfairly in response to Plaintiff's claim," by "failing to provide a reasonably factual explanation of the basis for not fully paying Plaintiffs' claim," "by conduct an unfair, unreasonable, self-serving and inadequate investigation of Plaintiff's claim," by "failing to give equal consideration to fully paying the claim as to not fully paying the claim," and "by unreasonably undervaluing the loss and failing to fairly negotiate the amount of the full loss." (Doc. 1 ¶27.d–k). These conclusory variations on Plaintiffs' claim that Defendant's settlement was unreasonable are unsupported by clear and convincing evidence. Plaintiffs do not attempt to point out evidence creating a genuine dispute of material fact as to whether Defendant lacked a reasonable basis for denying them additional coverage.

Several other varieties of alleged bad-faith conduct relate not to a denial of additional coverage, but to other alleged consequences of

Defendant's actions. (Doc. 1 ¶27l, n, r, s, & t). As such, these are not proper bases for a §8371 bad faith claim.

Plaintiffs go on to claim that Defendant "unreasonably, deliberately, and extremely delay[ed] the release of any advance funds," (Doc. 1 ¶27m), but do not identify an entitlement to such funds. They also posit that Defendant "condition[ed] payment" on their acceptance of it as accord and satisfaction. (Doc. 1 ¶27o; Doc. 117 ¶16). To support this assertion they offer an April 29, 2019 email from Defendant to Plaintiff's representative. (Doc. 117 ¶16; Doc. 118-12). In these emails, Defendant referenced the adjustor's actual cash value estimate, noted that Plaintiffs had requested payment of that amount, and stated that Defendant was "prepared to pay this amount … and simply ask that at this time you confirm that … you agree with this evaluation." (Doc. 118-12 at 2). In response, Plaintiffs requested payment but unequivocally denied agreement with the estimate. (Doc. 118-12 at 3 ("The insured is not in agreement with anything from the carrier.")). The following day, Defendant asked Plaintiff's representative where the checks should be sent, and stated that its payment of the actual cash value estimate was being made "without prejudice." (Doc. 112-14). And it is undisputed that Defendant made this payment on May 1, 2019. (Doc. 118-11). So this

evidence does not demonstrate any lack of a reasonable basis for denying additional coverage.

Plaintiffs further claim that Defendant "act[ed] in concert with public authorities" and pressured them to "deem the cause of the loss as something that would support a declination of coverage." (Doc. 1 ¶27p). But they do not now offer evidentiary support for this assertion. And once again, it is undisputed that Defendant *did not* deny Plaintiff's coverage altogether. Similarly, they assert that Defendant "restrict[ed] access to the premises and refused" to release until five months later. (Doc. 1 ¶27r). For this assertion they offer Mr. Baker's testimony that Defendant's cause and origin investigator, Lisa Breneman, told Plaintiffs that they could not access the property pending her investigation. (Doc. 118-14 at 3). Mr. Baker did not testify as to how long Plaintiffs' access was restricted, and Plaintiffs state that Ms. Breneman conducted her inspection on November 7, 2018 and issued her report on January 21, 2019. (Doc. 117 ¶7; Doc. 118-4). The court does not see, and has not been informed, how this evidence demonstrates that Defendant lacked a reasonable basis for not paying Plaintiffs more than $335,795.07. And Plaintiffs' allegation that Defendant "fail[ed] to conduct an independent investigation into the origin and cause of the fire," appears both contradicted by their counterstatement of facts, (Doc. 117 ¶7; Doc. 118-4),

and irrelevant, because Defendant did not deny Plaintiffs' coverage based on the fire's origin. With regard Plaintiffs' allegation of lapses in communication, (Doc. 1 ¶27s), they offer Mr. Baker's testimony that at one point during the investigation process, Defendant "stopped communicating completely," except for "some sporadic … remedial correspondence," for about four or five months. (Doc. 118-8 at 4). But again, following these alleged lapses in communication, Defendant undisputedly did pay Plaintiffs. There is no apparent connection between this evidence and a claim that Plaintiffs should have been paid more than $335,795.07.

Finally, Plaintiffs argue that Defendant "misrepresent[ed] the replacement cost provisions of the Policy by claiming that Plaintiffs could never receive holdback/withheld depreciation funds because the property was not replaced by that date." (Doc. 118 at 4). To the contrary, Mr. Pelletier's September 24 and October 9, 2019 letters merely quoted §1.C.1.d of the Policy, which provides that "[w]e will pay no more than the actual cash value of the damage until actual repair or replacement is complete." (Doc. 112-17 at 1; Doc. 112-19 at 1; Doc. 112-13 at 17 §1.C.1.d ("Section I – Exclusions")). He did not indicate that Plaintiffs needed to have rebuilt within 6 months to *ever* receive replacement costs. Instead, he specified Defendant's position that it was not obligated to pay replacement cost value

"at this point in time." (Doc. 112-19 at 1). Plaintiffs have not shown that Defendant misrepresented the Policy.

In sum, Plaintiffs have not supported their bad faith claim with record evidence, and Defendant is therefore entitled to summary judgment on this claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be granted. An appropriate order will follow.


**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 4, 2024**
19-1838-02

- 22 -